Good morning ladies and gentlemen. Our first case for this morning will be United States v. Toby Jones, Mario Whitfield v. Kelsey Jones. And Mr. Stanton, are you the first? I am. Good morning. May it please the court, counsel. My name is Bill Stanton. I represent Kelsey Jones. After Kelsey's motion to suppress evidence was denied, he proceeded to a jury trial. The jury found him guilty of conspiracy to possess and distribute a controlled substance, as well as distribution of a controlled substance. He was also found guilty of conspiring to kill an informant, attempting to kill an informant, and discharging a firearm during a crime of violence. He was sentenced to 35 years in the Bureau of Prisons. On appeal, Kelsey argued that he was not proven guilty beyond a reasonable doubt, that the district court erred in denying his motion to suppress, that the district court erred in denying his buyer-seller jury instruction, and that his sentence wasn't properly enhanced. Kelsey asked this court to reverse the remand for a new trial and a new sentencing hearing. I'd like to address the denial of the motion to suppress first. At the motion to suppress hearing, three law enforcement agents, as well as Kelsey, testified. The first agent to testify was a detective from the Oak Park Police Department, Detective Spirandio, and his testimony essentially stated that Kelsey gave him verbal consent to search the apartment back at the Oak Park Police Department. So why wasn't that a credibility determination? It's just a finding of fact, really, that the district court has to make. There's no requirement that there must be signed permission. No requirement whatsoever. I agree with you. The credibility determination, though, Detective Spirandio's alleged getting the verbal consent was two or three hours after agents had been inside Mr. Jones' apartment and searched it. Well, there were three agents, Sisto and Labneau and Spirandio. Correct. And these three agents all testified to consent-to-search forms that were purportedly shown to Mr. Jones. On each of those consent-to-search forms, there was a notation that Mr. Kelsey Jones refused to sign. No notation that he refused to sign, but he gave oral consent to search, just that he refused to sign. So you have three agents, two DA agents and one Oak Park detective, who many combined years' experience in the law enforcement field, who all had different stories about how this verbal consent allegedly came about. But can you think of any case in which, when the district court has made this finding of fact, that there was verbal consent, that we've struck down a search on the ground, that there's no consent? I can't think of any case. I know the credibility determination is accorded great weight by this court. I just think, based upon the record in this case, the juxtaposition of the different testimonies of the law enforcement agents. Right. It would be possible for a district judge to have come out the other way on this, and I understand the frustration defense counsels sometimes feel in those situations. But also, Mr. Jones' testimony, according to the district judge, had its own improbabilities and internal contradictions, right? Certainly. So Mr. Jones testified on his own behalf at this motion hearing, and what his testimony was, was I said there's nothing in here anyway, or something to the effect of that. Now, Agent Labneau submitted a report, a report that he created some three and a half months after this search took place, where he quoted Mr. Jones as saying, there ain't nothing in there anyway. Now, go ahead and search, there ain't nothing in there anyway, but there ain't nothing in there anyway.  As a corollary matter, Kelsey's testimony at this suppression hearing was then used as an obstruction of justice penalty against him in sentencing. And in order for that to apply, his testimony had to be willfully false. Compared to the testimony of the agents, where this incident was not clearly remembered, and I don't think the right hand knew what the left hand was doing here, I think Kelsey's testimony was pretty consistent that he was not shown a form until he got to the police station, and that he never gave verbal consent at his apartment. So there's a bit of transcript that the government set out on pages 37 and 38 of its brief that reviews some of Kelsey's testimony at this suppression hearing, and I think that's what the district court is finding he's lying about, right? I would agree that that specific excerpt of his testimony was what was found to be obstructive, that he was willfully providing false information about material facts. Right, and surely the question whether this was a good search or not is a material part of this case. Absolutely. The search did result in the discovery of a number of sweatshirts that had gunshot residue on them. Right. So, yeah, I mean, it's just a standard of review problem that you have. The district court, it seems to me, has made the findings that were necessary to make about the willful, well, about the materiality and the willful lies. Right, Judge, and there is a mountain to climb here for Mr. Kelsey Jones. We appreciate that, and I'm not criticizing you personally, but it's just hard to see how the district court strayed so far that reversible error exists on either the result of the suppression hearing or what would flow from those findings, the obstruction problem later on. Mr. Stanton, could I ask you about the retaliation question here? I understand you to be arguing that the evidence was insufficient to convict Mr. Kelsey Jones of shooting Ringswald and his brother, if I remember correctly. His brother, Mark, correct. His brother, Mark, in retaliation for Ringswald's cooperation. Retaliation, you argue there's no real evidence of motive, and we actually see a lot of cases about retaliation from the employment discrimination side of things, where we look to protected activity. Ringswald was cooperating. Shooting would count as adverse action, right? And the question is, is there a causal connection? Given that there is disputed testimony, but the jury found that he was properly identified as the shooter, we start looking at circumstantial evidence to determine motive, and it's hard to see another one. Well, initially we would posit that Kelsey was not the shooter in this case. I understand that argument, yes, but we've got the victims identifying him. Two of the three alleged victims eventually identify him, not initially but eventually. To answer your question about the causal connection, as of the date of the shooting, Kelsey had not been on any recorded calls with this Jamie Ringswald, had not been alerted by law enforcement agents that he was the subject of an investigation by them, and not really had any specific dealings with Jamie that would cause Kelsey to believe, Jamie's tricking on me or ratting me out. I need to go cause him harm to prevent him from completing this cooperation against me. I don't think there's any direct evidence of that. Circumstantial evidence of that is phone calls between Kelsey and his brother. There was some call activity that was increased in the days prior to the shooting. But you would agree that circumstantial evidence is perfectly competent to prove this. It doesn't have to be direct. Reliable circumstantial evidence is competent to prove it. I don't think in this case we had that, though. Okay. Well, if you want to save a little bit of rebuttal, you may do that. I appreciate it. Thank you. And Mr. Kelleher, you're next for Toby. Good morning, Your Honors. Christopher Kelleher on behalf of Toby Jones. We have raised two issues on appeal, the insufficiency of the evidence and the unduly suggestive identification procedures. Recognizing the high hurdle of a challenge to the sufficiency of evidence, the facts here are unusual. Constructive possession was found despite the following. Toby Jones was nowhere near this gun. The gun was not found in his home or in his car or on his person. The exchange between the CI and Wesley Fields did not occur at a premises controlled by Mr. Jones in his home or in his car. But don't we need to look at the other end of the telescope, basically? The government presents evidence showing that Toby intends to purchase the Glock from the undercover agent for himself. He sort of states the price, the six jabs. He sends an agent, he sends somebody else, Fields, to go get the gun. There are text messages that show that he's involved in this and that Fields is doing what Toby wants him to do. And so why does it make any difference if he's physically there or if he has, there's no rule that says he has to have exclusive control of the premises. So looking at the evidence the government does have, why is that not enough? Your Honor, certainly there is evidence, text evidence, video evidence, between Toby and the undercover agent discussing the terms of the deal. But the precise- And then Fields carries it out. So, I mean, the use of an intermediary is not unusual. True, Your Honor. But in this instance, Mr. Fields, at least initially, testified that he essentially was going to go off on his own. He was potentially going to buy the guns just with cash. Eventually he did change his story and then later implicated Toby. But there is some confusion, from Mr. Fields' testimony at least, as to what the terms were. But can't the jury credit that, you know, there is evidence that it happened the way the government says it happened. The jury apparently believed it. Certainly. I'm not going to deny the fact that there is texting and video evidence regarding the terms of the deal. But one point I would also ask the court to consider is the fact that there is a significant lack of analogous case law that the prosecution cites. The district court's reliance, I believe we distinguished pretty easily in our briefs the three cases the district court cited. So I think the facts of this case, again, are unique. This is a sui generis case. What makes it so unusual, just the fact that Fields is the intermediary? That Fields is the intermediary, that Toby was never seen with this gun, that his premises, whether it's his house or his car, the gun was never seen there or found there, that Mr. Fields had changed his testimony. And I acknowledge that essentially I'm blending into a credibility argument, which doesn't carry much weight here. So I think all those factors to consider, that Toby is nowhere near this gun, and future cases, future defendants could be enveloped in a situation where, again, they've never been seen with a gun, never touched a gun, never saw a gun, and yet they're held responsible for it. Right, but I guess they would be only if, as here, you could show that it's their gun. I don't think you can do this, but anyway, suppose you order the gun on some Internet website, and you certainly can, and it's your gun, you pay for it, and maybe you didn't actually physically touch it, but surely that's enough for maybe even actual possession,  It might be in that instance, Your Honor. So why it would matter that in this instance, given the nature of the form of payment, it wasn't going to be an Internet transaction, I assume, but Toby orders the gun, and he gets Fields to carry out the order, and now it's Toby's gun. Well, again, I would point to that being true, but to the fact that, again, Mr. Fields had said that he was going to buy the guns with cash. During the exchange, it almost didn't go through, because Mr. Fields was going to leave, get money, and come back. So Mr. Fields was not exactly a puppet. He did have some independence. He had talked about getting this cash himself. He was essentially going to potentially go off script. Obviously, that didn't happen. But he doesn't, though. Right. He exchanges the drugs for the gun. And then there's a second gun that we're not worrying about, I guess, here. Right. So I guess the problem is if all of the elements of the constructive possession offense are available in the evidence for the jury to credit, then it's hard to see why we would overturn it on insufficiency grounds. Yeah, sure. And just to segue into the aiding and abetting, which essentially I'm talking a little bit about there as well, that's a theory that was in, it was out, and then in the waning moments of the trial, it was in again. So didn't the government at some point disavow? Didn't they say at a pretrial conference they weren't going to go the aiding and abetting route? To be honest, Your Honor, I'm not sure if they explicitly said that, but it was part of the pretrial and then essentially was abandoned. And it never saw the light of day again until closing arguments was raised again. And, again, as we pointed out in our briefs, fundamental fairness was essentially thrown out the window. Toby can't be the star and a bit player simultaneously. But either theory works, is legally sufficient. True. So if Fields is the agent and Toby Jones is the principal, I thought the district court made findings to that effect. She did, Your Honor. With respect to the guy. She did. But, again, there was no, essentially no argument made by the prosecution, obviously no chance for Toby to put up a defense to the aiding and abetting theory. And on the identification, before you run out of time, even if we thought that it was suggestive, then that just takes you to the totality of the circumstances analysis. And so he keeps seeing the same, not just his picture being the same, but the other pictures are the same, too. So I don't know why that makes his picture jump off the page at you, for example. So I would like to know why, under the totality of the circumstances, this procedure is so bad that the identification should have been excluded. Well, and Your Honor does make a valid point that the pictures were the same of the other individuals, the other five individuals. But as far as the actual shooting itself and the events and the circumstances under which that took place, basically Mr. Barnshaw had just a couple seconds to look through this peephole. So it's just a peephole. But actually you can see a face through a peephole. That's pretty much all you can see. True. Did I understand correctly that Judge St. Eve visited the apartment and looked through the keyhole? Yes, she did. She was the trier of fact on this. Yes, she was. And as we point out in the brief, I mean, obviously it's good she did that. But, again, this is under controlled circumstances. I don't think she was high or drunk at the time. Glad to hear that. So hopefully not. We'll take that as stipulated. So stipulated. So I think that the conditions were a little bit different. And, again, Mr. Barnshaw then equivocates multiple times. He identifies Toby, then he says he's not sure. So he literally, I believe, I lost track, I think four times he flip-flops. So I think that's part of the circumstances here, that this is not an open and shut, he's 100% sure that this is the guy. So if there are no further questions, thank you for your time. All right, thank you. Mr. Franzblau. Good morning, Your Honors. May it please the Court, Sean Franzblau on behalf of the United States. Judge Wood, you asked a question that didn't get a clear answer. Yes, the answer is yes. Before the trial began, the government did say in a pretrial jury instruction conference that it was not going to pursue an aiding and abetting theory. That was at the time the parties were thinking that Toby Jones was going to try the case by jury. Five weeks later, he decided to take a bench trial, and we did raise the argument in closing. But I think the important thing I mean, there's a little bit of a troublesome aspect to that because one is going to defend against an aiding and abetting theory somewhat differently than you would defend against a constructive possession theory. And if the government suddenly brings it out at the last minute, I don't know whether there was objection made, but it's troublesome to me. Judge, in some cases, you would defend against aiding and abetting differently than constructive possession, but not here, and let me tell you why. The government's one and only claim about Count 9, our theory of the evidence was this, that Toby Jones sent Wesley Fields out as his surrogate to execute this gun for drug exchange on his behalf. Now, that triggers Section 924C liability under two different legal principles, constructive possession as well as aiding and abetting. And we talk about this in the closing. The second paragraph, Section 2 of aiding and abetting, is meant to cover those situations in which you send someone out to do something in your stead. So in this case, there's almost a complete merger between the two, and that's very important because what that means is there is no argument that would have been available to the defendant to argue against aiding and abetting that was not available to him that he would not have otherwise made to argue against constructive possession. In this case, it is the same thing. Now, the one very limited exception to that and where this actually… Yes, Your Honor. The same agency principles are driving both theories of liability. Now, the one exception to this and where this did come out at closing and, frankly, why it came out when the district court asked us directly, was in response to this argument that the defendant made that, well, Fields purchased one of the firearms with cash and the government hasn't proven… And the other with the cocaine. Yeah, which was for which. So we had three responses to that. Number one, it doesn't matter what was in Fields' mind. This is about Toby Jones' intent, and the evidence was crystal clear for months leading up to the deal. The day before the deal, one hour before the deal took place, he kept confirming the terms of the deal, six jabs of crack cocaine for that Glock 30. That was our first argument. The second argument was this is one and the same exchange. It's crack cocaine and money for two guns. It's one incident and one transaction, and the defendant's efforts to parse that into two separate things just simply didn't square with the evidence. Our third and final argument was where we said even if you don't find that, if you find that it wasn't clear that Toby understood he was exchanging drugs for the gun, or if you don't find that this was one single transaction, he'd still be guilty under aiding and abetting. So that is the one area where we stepped out beyond to a point where aiding and abetting and constructive possession don't entirely overlap. But I think the key point is, Your Honor, even if that was error, it was harmless, because the district court first and foremost ruled on constructive possession grounds, and almost really as a throwaway, if you read the opinion, the district court says, and I also find that it's aiding and abetting as well. We call those alternative holdings, not throwaways. Excuse me, Your Honor. Excuse me. As an alternative holding. So, Your Honors, for those reasons. And, of course, this purchase is from the undercover agent, so it's, you know. Correct. The other key thing to point out is that, you know, under the Ruiz case, the defendant has to show prejudice. He has to make some effort to show what he would have done differently. And, again, he can't do that here because, in this case, constructive possession and aiding and abetting are really one and the same thing. Now, he makes an interesting point moving on to the identification issue about identifying who this person was by this momentary glimpse through the peephole. I mean, there's enough problem with eyewitness identification to begin with before you're talking about peepholes. And I can certainly see how once you actually then start looking at photo arrays, you could be deluded into thinking that you're seeing that same face, and there's just no reason to link the two. Well, Your Honor, as far as the opportunity to observe that took place, Mr. Barlow testified that it was brief. He actually said there were two occasions. Two seconds, didn't he? He looked through. He stepped back. He looked through again. So these were very brief, but he testified that it was adequate. I got a good look at the face. It was enough time to recognize facial features. And, indeed, Judge St. Eve went out and inspected the scene and found that, yes, even a brief look is sufficient to be able to see through and see those facial features. Mr. Barlow testified that it was well lit. He did testify that he had used marijuana and had a couple beers earlier that evening, but he said he wasn't drunk. He did say he was a little bit high, but he said he was highly alert. So I think that his opportunity was brief, but it was sufficient. Was Toby Jones a stranger to him? Yes, Your Honor. Okay. Yes. In addition, there are these corroborating the circumstantial evidence that points to the reliability of the testimony, these extraordinary events that took place in this week in the spring of 2014. Mr. Barlow shot through his front door, identifies Toby Jones, a man he doesn't know, and he describes the second individual, a person who sounds a whole lot like Kelsey Jones. Three days later, another witness testifies, Marty Smith, that Toby Jones and Kelsey are out on the street. They're trying to hunt down the CI. They're asking people where he is, what kind of car he drives. Two days after that, Kelsey calls Marty Smith and asks him, are there any cameras in the back of your building? Sure enough, an hour later, Kelsey Jones attempts to murder Jamie and his brother. Meanwhile, at the time, the phone traffic, highly unusual call patterns between he and Toby Jones. When you put all of this evidence together and you consider the totality of the circumstances, I think there are sufficient indicia of reliability here. The identification is certainly not as strong as the Kelsey Jones identification, but there's enough evidence here, particularly when viewed in the light most favorable to the government, to sustain the conviction for Mr. Toby Jones. On the question of Toby Jones shooting – wait a minute, have I got the right – of – sorry, no, of Kelsey Jones shooting – Kelsey shoots Ringswald. Ringswald. Kelsey shot Ringswald, yes. That's the government's case. And the question of motivation, the defense suggested this morning that there was no evidence that Kelsey knew at that point anything about Ringswald's cooperation. Could you shed some light on that? Absolutely, Judge. So we know that Toby and Kelsey were brothers. They were involved in the underlying drug conspiracy together. Kelsey himself admitted to that. We know that they lived together in an apartment. And we know that within hours after Wesley Fields was arrested on March 26, Toby Jones knows that something is amiss. He is frantically calling anyone and everyone who was at this gun deal. And he – Jamie Ringswald testifies that he has a conversation with Toby Jones in which he is extremely agitated and he's demanding to know where Jamie is. Now, given Toby's obvious knowledge of what's going on and his close relationship with Kelsey, I think it's reasonable to infer, particularly given the rather extraordinary events that occurred in the days following, that Kelsey had an opportunity to learn what happened and that this was the obvious motivator. As Your Honor mentioned, there is really no other plausible explanation that why at this time, in this location, going after the same target that these two brothers would engage in this conduct, two attempted murders, for any reason other than – What did Kelsey or Toby know in response to the arrest of Fields, though? Well, Your Honor, on the afternoon of March 26, it's hard to say exactly what they knew, but they knew something was wrong. If you recall, there was testimony that – and Agent Labno – this is a recorded phone call that Agent Labno was sitting with Mr. Ringswald. They called Toby, and Toby at first says, have they bumped up with you yet? Have my guys met up with you? And where are they? They haven't come back yet. And the CI says something like, yeah, I just met up with them. They should be coming back to you. The testimony was that about an hour or so later, he talks to Toby again. Now there's a distinct change in Toby's tone of voice. He's agitated. He's demanding to know where they are. And Jamie is sort of putting him off and saying, hey, man, I don't know. I met with them. I met with them. That call is ended. Suddenly the phone goes off the hook with phone calls. So I think at that point it's reasonable to believe that Toby knew that something was amiss, whether he knew that at that particular moment that Fields was in custody, but it's reasonable to infer that he figured it out. Note, Jamie had introduced this unknown person to him. Fields goes out and meets with this unknown person and doesn't come home. It's reasonable to infer that he understood what happened. Your Honors, turning now to Mr. Jones's due process claims, there were two identification procedures that took place here. The first was with Detective Taylor at the Oak Park Police Station. The district court found that there was absolutely nothing wrong with that procedure, and the defendant doesn't argue otherwise. So the focus here is on that second procedure. That's just the first one is the black and white smaller photos. That's exactly right, Your Honor. So the second procedure took place June 2, 2014, after Mr. Barlow is arrested for his own drug trafficking crime. It's critical to point out three things happened before Agent Labnow showed Mr. Barlow any photographs. Number one, and most importantly, Mr. Barlow told Agent Labnow, I saw my shooter in that photo lineup that Detective Taylor showed me. The first one. That first one. I saw my shooter. He was depicted in it, and I stared at the shooter, consistent with what Detective Taylor had told Agent Labnow. Second, he said, I was scared at the time, but now I'm willing to cooperate. And third, he gave a very, very detailed physical description of his shooter that matched Toby Jones to a T. That is all before he's shown any pictures. So, Your Honors, I would argue that it was not only not unduly suggestive for Agent Labnow to go retrieve those same pictures, it was the only reasonable thing a law enforcement officer could do when he'd just been told by a witness to a shooting, my shooter was in that lineup. And it was all the same pictures. I mean, I thought that was of some significance. It was all the same pictures. But bigger in color. That's exactly right, Your Honor. Now, this is where it got a little sloppy, but it wasn't unduly suggestive. Agent Labnow went and tried to, as you say, get those large, single, individual color photographs to lay out for Mr. Barlow. On his way back into the room, the testimony was that he had them sort of splayed out like playing cards in his hand, with the top three visible and the bottom three not visible. He said the top three were equally visible. Toby Jones was in the third position. As he approaches Mr. Barlow, he makes this spontaneous identification in vulgar terms that I'm not going to repeat here, and Agent Labnow confirms this is the guy. And then Agent Labnow tries to back it up, admonish him, and do it properly. Now, was that optimal? No. It was sloppy. And when he does it, it's a one-at-a-time showing, right? Or does he lay them all out? Judge, when he walked out with the playing cards, for lack of a better term, they were individual pictures that Barlow picked out. Once he had picked out the individual photograph, he didn't want to lay those same things out for him. So what he did was he then put out a black-and-white version of that same lineup that Detective Taylor had showed him, and that's Barlow Photo Spread 2 in the government's attachment. So it was the same thing as Barlow Photo Spread 1 that Taylor initially showed him, just in black-and-white form because he didn't have a color copier with him. So again, the defendant cites cases that are entirely off-point. The key points here is that Kenshaw Barlow was never shown Toby Jones's photograph in isolation. Kenshaw Barlow was never shown multiple photo arrays in which Toby Jones was the only commonly depicted individual. And Kenshaw Barlow was only shown a photo array, the same photo array, a second time after he explicitly told law enforcement agents, my shooter was in that lineup. So that was not only not unduly suggestive, it was the only reasonable thing for law enforcement to do at that point. Your Honors, turning now to the sufficiency of the evidence, as to Mr. Kelsey Jones, just very briefly, the drug conspiracy evidence viewed in the light most favorable to the government, there really can be no question that it was adequate to sustain this conviction. He made a very detailed post-arrest admission in which he admitted that he had been working with his brother to distribute narcotics, cocaine, and heroin, that his brother had given him a cellular telephone that we refer to as the dope line. That was all from Agent Labnow? That was all from Agent Labnow. Was it reflected in reports? Yes, Your Honor. Now that was corroborated, of course, by Wesley Fields' testimony in which he described Kelsey's role as similar. And also, of course, the March 19, 2014, undercover deal with the video and audio recordings of, in which the CI and the UC met with Kelsey and Toby and purchased the largest amount of crack cocaine that they had purchased during the investigation. It's important to note that during his post-arrest interview, Kelsey admitted that he packaged the drugs that were sold on that day. He told Agent Labnow the weight of the drugs, and he was right. And he also said that he rode with his brother to provide security that day. And that makes sense because he was selling a particularly large quantity of narcotics that day. Now, as to the identity evidence against Kelsey Jones, this was, frankly, the most overwhelming part of the government's case. We had two eyewitness identifications. We had Marty Smith, the testimony of the phone call asking about the cameras, just an hour before the shooting. We had Marty Smith days before Kelsey asking him, where is Jamie, what kind of car does he drive? We had the forensic evidence when we searched Kelsey's apartment, the sweatshirts matching the shooter's clothing with gunshot residue concentrated on the left cuff. All of the witnesses, well, the people who saw the defendant with the gun in his hand, Jamie and Mark consistently testified. He held it in his left hand. We had Wesley Fields' testimony. Remember, Wesley Fields was in jail by this point. He didn't know anything about the shooting. Wesley Fields says, the morning of March 26th, before I got those drugs and money from Toby Jones, Kelsey Jones, I went up to the apartment. Kelsey Jones took out a silver, a chrome and black 9mm handgun, showed it to me and said, this is the new toy. And, of course, all of the witnesses, Jamie and Mark, who saw the gun in his hand described it as a chrome and black handgun. We know from forensics that it was a 9mm. The evidence here is simply overwhelming. Your Honors, very briefly to the buyer-seller instruction. I don't need to tell this court. District courts are not in the business of giving jury instructions for which there is no evidence to support. That is confusing for juries. We hope not. As you pointed out in the Lomax case, the buyer-seller's instruction is only to be given if a rational jury could find that a defendant merely bought or sold drugs but did not engage in a conspiracy. Here, no rational jury could find that. All of the evidence was evidence concerning jointly undertaking conduct to distribute narcotics together. There was none of that kind of evidence that we saw in the Cruz or Garcia case where the evidence was about the defendant and his alleged co-conspirators standing on opposite ends of the transaction. The only thing approximating that was Wesley Field's testimony that sometimes he gave drugs to Kelsey. There was no follow-up about that, and it absolutely pales in comparison to the conspiracy evidence. The district court did not err. Your Honors, unless there are any further questions, I will conclude. For all of these reasons, we would ask that you confirm the conviction and sentence of Kelsey Jones and the conviction of Toby Jones. Thank you very much. Thank you very much. Anything further, either Mr. Stanton or Mr. Kelleher? Your Honors, I'd like to briefly respond to the buyer-seller jury instruction argument that counsel just made. This is obviously entitled to de novo review, and Kelsey Jones was entitled to that instruction if the evidence supported it. How does the evidence support it? I mean, it seems to me, I mean, he gets a personal use instruction anyway, but I don't see any evidence that he's out there as a buyer or as a seller. Wesley Field said that he's providing Kelsey with user amounts often. It's determined that Kelsey's doing six or seven bags of heroin a day, and Marty Smith testified that he knew Kelsey to be an addict. The only testimony we had of Kelsey dealing drugs was Marty saying sometime in 2013 he dealt me drugs without any specificity, and Mark Ringswald, the informant's brother, stating it was the winter of 2014 that Kelsey dealt me drugs. Right, but it's actually a big operation. I mean, the government's theory is that maybe Kelsey wasn't the one who was personally doing all of this. Right, and a big operation where Kelsey supposedly has this phone 12 hours a day yet is not on any recordings with government agents or the informant. I see that my time is up. If you have no further questions, I thank you for your time. All right. Thank you. And I think maybe you have about a half a minute, Mr. Kelleher, if you would like to use it. As far as Mr. Barlow goes, the June 2nd identification was made only after Agent Labneau and the federal government had a federal prosecution hanging over him. So he didn't see the light until this prosecution. As far as Mr. Fields goes, and I know in the brief we've made essentially some credibility arguments, but this is an unusual situation where you have a fact finder admit in writing, in the oral opinion, that Mr. Fields is a liar. So the fact that the central witness of this case against Mr. Jones, the fact finder, admits he's a liar, that bears some weight. And I would ask the court to consider that. All right. Thank you very much. And you all were appointed, were you not? Yes. We appreciate your service to the clients and to the court. Thanks as well to the government. We'll take the case under advisement.